# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 5, 2010

## STATE OF TENNESSEE v. O'NEAL JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-05474    Chris Craft, Judge**

---

**No. W2010-00405-CCA-R3-CD  - Filed November 19, 2010**

---

The defendant, O'Neal Johnson, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and was sentenced to twenty-five years in the Department of Correction at 100% as a violent offender.  On appeal, the defendant challenges the sufficiency of the convicting evidence.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Wilson Jones, District Public Defender; Barry W. Kuhn (on appeal) and Trent Hall and Timothy J. Albers (at trial), Assistant Public Defenders, for the appellant, O'Neal Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and J. Robert Carter, Jr. and Scot A. Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In December 2007, the twelve-year-old victim, M.T.,[1] discovered that she was pregnant as a result of the defendant's sexually penetrating her during the months of April

---

[1] It is the policy of this court to refer to minors by their initials only.

to October 2007. For his actions, the defendant was indicted on one count of rape of a child.

**State's Proof**

At trial, the victim testified that the defendant lived with her and her mother, her younger sister, and her two younger brothers during the period of April to October 2007. The victim recalled that during that time period, when they were residing at a house on McCrory Avenue and later Appian Cove, the defendant "touch[ed] [her] in the wrong spot." She elaborated that the defendant touched her "[i]n [her] private parts" or vagina, and he did so on more than ten occasions. The victim shared a bedroom with her sister, and the defendant picked her up out of bed, took her to the living room or kitchen, laid her on the floor, and "pull[ed] [her] pants down." Once the defendant took the victim's pants off, he had the victim get on her hands and knees and stuck his penis "[i]n the back." The victim clarified that the defendant put his penis in her vagina. The victim said that to the best of her knowledge, the defendant's penis did not go into any other part of her body. She said that "[i]t hurt[] . . . [e]verywhere below [her] waist" when the defendant did this to her. The victim said that she never struggled with or told the defendant "no" because "he said if [she] ever t[old] he would threaten to kill [her] and [her] momma," which made her feel sad and scared. The defendant never threatened to harm himself.

The victim testified that up until October 1, 2007, the defendant was the only person who had ever touched her vagina with a penis. In December 2007, the victim was visiting with her aunt and cousin when they "noticed that [her] stomach was starting [to] get[] big." After taking a pregnancy test, the victim admitted that the defendant had touched her, but her mother did not believe her. The victim gave birth to a full-term baby on March 31, 2008.

On cross-examination, the victim testified that she recalled giving a statement at the Child Advocacy Center on January 2, 2008, in which she said that the defendant's penis went in her "butt." However, she said that she told the interviewer that the defendant had put his penis in her vagina, but she did not think the interviewer wrote that down. She also acknowledged that she told the Child Advocacy Center that the defendant had threatened to kill himself, not her or her mother, if she told.

The victim's sister, A.H., testified that she was currently thirteen years old. During the time period of April 1 to October 1, 2007, the defendant was her mother's boyfriend and resided with their family. On an occasion when the group was living in a house on Appian Cove and her mother was at work, A.H. and her two brothers were watching a movie in her mother's bedroom, when A.H. walked toward the kitchen and "saw [the victim] on her hands and knees." The victim had her school uniform on, but her pants and underwear were

down below her knees. Someone was holding his hand over the victim's mouth and using his other hand to pull back the victim's hair. A.H. assumed that the hands belonged to the defendant "[b]ecause he was the only man in [their] house" at the time. The victim buttoned and zipped her pants and the man zipped his pants, and A.H. asked the victim what was going on. A voice A.H. recognized as the defendant's said, "Nothing." A.H. asked the victim to start another movie for them, and the victim told the defendant "to go put on another movie" and he did. A.H. said that she had seen the defendant with a gun "[m]any times" and that he kept it in a drawer in her mother's bedroom. A.H. stated that she was scared of the defendant.

The victim's older cousin testified that in December 2007, she noticed that the victim's stomach "looked a little big . . . for her age." Holmes and her mother purchased a pregnancy test and assisted the victim in taking it, and it returned a positive result. The victim admitted to her cousin that the defendant had been touching her.

Eddie Scallions, an investigator with the district attorney's office, explained the process for collecting specimens for a "rape kit" and testified that he collected buccal swabs of the defendant's DNA and turned them over to Larry Eaves, another investigator in the district attorney's office.

Thomas Shouse, an investigator with the district attorney's office, obtained buccal swabs of the victim's DNA and turned them over to Larry Eaves.

Larry Eaves testified that he collected buccal swabs of the DNA of the victim's baby and transported the swabs, as well as the swabs collected by the other investigators, to Orchid Cell Mark Laboratory for testing.

Dr. Deborah Cutter, laboratory director of Orchid Cell Mark Laboratory in Nashville, was accepted as an expert in microbiology and DNA. Dr. Cutter explained that individuals receive a combination of DNA from their mother and father, and she described the process for establishing paternity. Dr. Cutter testified that she analyzed the samples obtained in this case, and the defendant could not be excluded as the baby's father. Moreover, she determined that the "probability of paternity" was 99.99 percent, "which is [their] highest reportable probability."

**Defendant's Proof**

The defendant, via undirected narrative, testified that he started living with the victim's mother and her children in 2005, and they were romantically involved. Over the years, they resided in an apartment and three different houses together, moving first to "get

[the children] in a better environment" and then to get the children in a better school. The defendant recalled an incident when the victim's mother allowed her uncle to babysit the children when the victim was twelve years old. The defendant was concerned because the uncle was "drunk and talking out of his head," but the victim's mother believed the children would be all right. The defendant and the victim's mother went to a movie and returned home around 11:30 p.m. to find the uncle asleep on the sofa and the children asleep on the floor in front of the sofa.

The defendant testified that he and the victim's mother walked to their bedroom, and then he returned to the living room to find the victim lying on the couch next to the uncle with "her whole shirt . . . off, breast exposed" and the uncle "was playing asleep." After having the uncle leave, the defendant talked to the children about inappropriate touching, and he and the victim's mother decided to keep the uncle away from their house. However, the uncle periodically came by to bring items to the victim, so they moved again to get further away from the victim's mother's family.

The defendant testified that they later "decided to upgrade" and moved to a house in the county. In mid-December 2007, the defendant was arrested for an unrelated incident and, while incarcerated, received notification that he had been indicted for the sexual child abuse of the victim. Several months later, the defendant was released from jail, and he relayed the normal events in the household, including caring for the victim's new baby, until the children were removed from their home. He was later arrested on the indictment in this case. The defendant denied having sexual relations with the victim.

Upon the conclusion of the proof, the jury convicted the defendant as charged of rape of a child. After a sentencing hearing, the defendant was sentenced to twenty-five years at 100% as a violent offender.

## ANALYSIS

The defendant challenges the sufficiency of the convicting evidence, arguing that "[t]he evidence in this case consists essentially of the uncorroborated testimony of the twelve year old child victim." In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v.

-4-

Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2006). "Sexual penetration" is "sexual intercourse, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Id. § 39-13-501(7).

In the light most favorable to the State, the evidence was more than sufficient for a rational trier of fact to convict the defendant of rape of a child. The victim testified that during the months of April to October 2007, when she was twelve years old, the defendant penetrated her vagina with his penis on more than ten occasions in the family's living room or kitchen. She recalled an instance where the defendant had her on all fours as he penetrated her vagina from behind. The victim's sister, A.H., recalled an instance when she saw the victim with her pants and underwear pulled down and on all fours in the family's kitchen, while someone was behind the victim holding a hand over her mouth and also holding her hair back. The victim's sister said that the defendant was the only adult male in the house at the time, and she recognized the defendant's voice when he said that "nothing" was going

on. The victim said that the defendant was the only one who had penetrated her vagina with a penis. A paternity test was offered into evidence, establishing that there was a 99.99% probability that the child born to the victim on March 31, 2008 was fathered by the defendant. Any issues concerning the credibility of the witnesses were resolved by the jury as the trier of fact. The defendant is not entitled to relief on this issue.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE